# Enforceability of 18 U.S.C. § 1302

Application of 18 U.S.C. § 1302 to prohibit the mailing of truthful advertising concerning certain lawful gambling operations would violate the First Amendment. Accordingly, the Department of Justice will refrain from enforcing the statute with respect to such mailings.

## Letter Opinion for the Speaker of the House of Representatives

September 25, 2000

This is to inform you of the Department of Justice's determination that, in light of governing Supreme Court precedent, the Department cannot constitutionally continue to apply 18 U.S.C. § 1302 to prohibit the mailing of truthful information or advertisements concerning certain lawful gambling operations.

### I.

The central opinion that informs the Department's decision is *Greater New Orleans Broadcasting Ass'n v. United States*, 522 U.S. 173 (1999). In that case, an association of Louisiana broadcasters and its members challenged the constitutionality of the federal statute prohibiting the broadcasting of information concerning lotteries and other gambling operations. The statute in question, 18 U.S.C. § 1304 (1994), provides in relevant part:

> Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States . . . any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance . . . shall be fined under this title or imprisoned not more than one year, or both.

The broadcasters sought permission to broadcast advertisements for lawful casino gambling in Louisiana and Mississippi. The Supreme Court held that the First Amendment prohibits application of § 1304 "to advertisements of private casino gambling that are broadcast by radio or television stations located in Louisiana, where such gambling is legal." 527 U.S. at 176.

The Court reviewed the constitutionality of § 1304 under the "commercial speech" test of *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557 (1980). *See Greater New Orleans*, 527 U.S. at 183. Under that test, when a government regulation restricts truthful speech proposing lawful commercial activity, the court must "ask whether the asserted governmental interest is substantial." *Central Hudson*, 447 U.S. at 566. If the interest is substantial, the court determines whether the regulation "directly advances the govern-

1

mental interest asserted'' and whether it ''is not more extensive than is necessary to serve that interest.'' *Id.* As the Court observed in *Greater New Orleans*, ''the Government bears the burden of identifying a substantial interest and justifying the challenged restriction.'' 527 U.S. at 183.

In the *Greater New Orleans* case, the government identified two basic governmental interests served by § 1304: minimizing the social costs associated with gambling or casino gambling by reducing demand, and ''assisting States that 'restrict gambling' or 'prohibit casino gambling' within their borders.'' 527 U.S. at 185–87. The Supreme Court determined that, as applied to truthful advertising for lawful casino gambling by broadcasters located in states that permit such gambling, § 1304 does not directly advance either interest and is an impermissibly restrictive means of serving those interests. *Id.* at 188–96.

As to the government's interest in minimizing the social costs of casino gambling by reducing consumer demand, the Supreme Court concluded that ''[t]he operation of § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it.'' *Id.* at 190. The Court pointed to the various exceptions that Congress has engrafted onto § 1304 over the years, particularly the exception for broadcast advertisements for Indian gambling (*see* 25 U.S.C. § 2720 (1994)). The Court concluded that by permitting advertisements for Indian casino gambling and certain other kinds of gambling to be broadcast on a nationwide basis, Congress had effectively made it impossible for § 1304 to accomplish its original goal of minimizing the social costs of gambling by reducing consumer demand. In addition, the Court noted that Congress could have employed various ''practical and nonspeech-related forms of [casino gambling] regulation,'' such as restrictions on casino admission and credit, that ''could more directly and effectively alleviate some of the social costs of casino gambling.'' 527 U.S. at 192.

The Court also determined that the other asserted governmental interest, that of assisting States that restrict casino gambling, ''adds little to [the government's] case.'' *Id.* at 194. First, the statutory exceptions that prevented § 1304 from directly and materially advancing the federal government's interest in minimizing the social costs of casino gambling were equally inimical to the efforts of non-casino states: ''We cannot see how this broadcast restraint, ambivalent as it is, might directly and adequately further any *state* interest in dampening consumer demand for casino gambling if it cannot achieve the same goal with respect to the similar *federal* interest.'' *Id.* (emphasis added). Second, the Court concluded that § 1304 ''sacrifices an intolerable amount of truthful speech about lawful conduct when compared to all of the policies at stake and the social ills that one could reasonably hope such a ban to eliminate.'' *Id.* The Court reasoned that prohibiting casino gambling advertisements in all States in order to protect the interests of non-casino States is ''neither a rough approximation of efficacy, nor

a reasonable accommodation of competing State and private interests.'' *Id*. at 194–95.

The Court concluded by stating:

> Had the Federal Government adopted a more coherent policy, or accommodated the rights of speakers in States that have legalized the underlying conduct, see *[United States v.] Edge [Broadcasting Co.]*, 509 U.S. [418,] 428 [(1993)], this might be a different case. But under current federal law, as applied to petitioners and the messages that they wish to convey, the broadcast prohibition in 18 U.S.C. § 1304 and 47 CFR § 73.1211 violates the First Amendment.

*Id*. at 195.

## II.

After the *Greater New Orleans* decision was issued, the Department was required to consider whether the application of § 1304 to the broadcasting of truthful advertisements for lawful casino gambling violates the First Amendment, regardless of whether the statute is applied to broadcasts originating in States that permit casino gambling (as was the case in *Greater New Orleans*) or in States that do not. This question arose in the case of *Players International, Inc. v. United States*, 988 F. Supp. 497 (D.N.J. 1997), *appeal pending*, No. 98–5127 (3d Cir. 1999). In a supplemental brief submitted to the Third Circuit on behalf of the United States, the Justice Department observed that ''while the Court's *holding* in *Greater New Orleans* is confined to broadcasts originating in casino gambling States, the Court's *reasoning* indicates that section 1304, as currently written, cannot constitutionally be applied to broadcasts originating in non-casino States either.'' *See* Supplemental Brief for the Appellants at 6 (emphasis in original), *Players Int'l, Inc. v. United States* (No. 98–5127) (''U.S. Brief''). This view reflected the conclusion that the same deficiencies and inconsistencies that the Court in *Greater New Orleans* held to undermine the government interests there were also present when the statute was applied to broadcasts originating in non-casino States.

As noted above, the Court in *Greater New Orleans* found that § 1304 did not directly advance the government's interest in minimizing the social costs of casino gambling because the statutory exceptions to § 1304, particularly the exception for Indian gambling, preclude the statute from meaningfully reducing public demand for casino gambling. *See* 527 U.S. at 193–95. The exception for Indian gambling is *nationwide* in scope: advertisements for Indian gambling may be broadcast in every State, including States that prohibit private casino gambling. *See* 25 U.S.C. § 2720. The same is true of the other statutory exceptions to § 1304

3

except for the one covering state lotteries. *See* 18 U.S.C. § 1307(a) (1994). As a result, the Department determined that there is no reason to believe that § 1304 is any more effective in minimizing the social costs of casino gambling for residents of *non-casino* States than it is for residents of casino States. *See* U.S. Brief at 7.

The Court in *Greater New Orleans* also held that § 1304 was an impermissibly restrictive means of dealing with the social costs associated with casino gambling because those costs "could [be] more directly and effectively alleviate[d]" by "nonspeech-related forms of regulation." 527 U.S. at 192. The Department concluded that this determination, too, is equally applicable with respect to broadcasts originating in non-casino States. If measures such as "a prohibition or supervision of gambling on credit" are more effective than § 1304 with respect to gamblers who live in States that permit casino gambling, as the Court found, they would appear to be equally effective as to gamblers who visit from non-casino States. *Id.*

Finally, the Department decided that the Court's conclusion in *Greater New Orleans* that the federal goal of assisting non-casino States "adds little to [the] case," *id.* at 194, also holds true with respect to the application of § 1304 to broadcasts originating in non-casino States themselves. The Court stressed the fact that the "ambivalent" federal advertising restriction, with its exceptions for Indian gambling and other gambling activities, cannot "directly and adequately further any *state* interest in dampening consumer demand for casino gambling." *Id.* That reasoning would rebut the argument that the application of § 1304 in non-casino States directly advances the anti-gambling policies of those States.

Given these considerations, the Department's brief in *Players* asserted that § 1304 may not constitutionally be applied to broadcasters who broadcast truthful advertisements for lawful casino gambling, regardless of whether the broadcasters are located in a State that permits casino gambling or one that does not. In conjunction with the filing of that brief, the Solicitor General notified both Houses of Congress that the Department is no longer defending the constitutionality of § 1304 as applied to such broadcasts. *See* Letters for Hon. J. Dennis Hastert, Speaker of the House, U.S. House of Representatives, and for Hon. Patricia Mack Bryan, Senate Legal Counsel, U.S. Senate, from Seth P. Waxman, Solicitor General, U.S. Department of Justice (Aug. 6, 1999).

## III.

In light of the *Greater New Orleans* decision, the U.S. Postal Service was faced with the question whether that opinion might also render unconstitutional certain applications of 18 U.S.C. § 1302, which prohibits the mailing of essentially the same kind of gambling-related matter covered by the analogous broadcast restrictions of 18 U.S.C. § 1304. Section 1302 provides in relevant part:

> Whoever knowingly deposits in the mail, or sends or delivers by mail:

> Any letter, package, postal card, or circular concerning any lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance;

> . . . .

> Any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance, . . . .

> . . . .

> Shall be fined under this title or imprisoned not more than two years, or both; and for any subsequent offense shall be imprisoned not more than five years.

The Postal Service therefore wrote the Department of Justice seeking its guidance as to whether. § 1302 remained constitutionally enforceable.[1] The Service's letter stated: "Without some interpretation on this point the Postal Service will be in a position of receiving requests for mailing services and for interpretations of both our mailing requirements statutes and the criminal statute, which should be guided by the Department of Justice." The Service further expressed the view that, in light of the *Greater New Orleans* decision, § 1302 "is now indefensible in federal court." Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Elizabeth P. Martin, Chief Counsel, Consumer Protection Law, U.S. Postal Service (Oct. 19, 1999).

After thorough consideration of the matter, I have concluded that the application of 18 U.S.C. § 1302 to the mailing of truthful advertising concerning lawful gambling operations (except as to state-operated lotteries in some circumstances, *see* p. 8, *infra*) would be unconstitutional. I have further concluded that, because of such unconstitutionality, the Department should no longer enforce the statute against such mailings.

As reflected in the text of the respective statutes, § 1302 imposes restrictions on mailed communications regarding gambling or lottery matter that are nearly identical to those imposed by § 1304 with respect to broadcast communications on the same subject matter. Further, § 1302 is subject to the same weakening exceptions that the Supreme Court considered fatal to § 1304's constitutionality in *Greater New Orleans*. I therefore find no reasonable basis for distinguishing

---

[1] Letter for Josh Hochberg, Chief-Fraud Section, Criminal Division, U S. Department of Justice, from Elizabeth P. Martin, Chief Counsel, Consumer Protection, U.S. Postal Service, *Re Interpretation of Greater New Orleans Broadcasting Assoc., Inc.* (Aug 10, 1999)

the provisions of § 1302 from those of § 1304 with respect to the constitutional question presented here. The former's restrictions against the mailing of truthful information concerning lawful gambling activities conflict with First Amendment standards for the same reasons that apply to the latter's restrictions against broadcasting the same kind of information.

A.

Just as the First Amendment applies to the governmental restrictions on broadcasting challenged in *Greater New Orleans* and *Players*, it applies, as well, to the governmental restrictions on the dissemination of information through the mails that are at issue here. See, e.g., *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) (federal statute prohibiting unsolicited mailing of contraceptive advertisements held to be an unconstitutional restriction on commercial speech); *Blount v. Rizzi*, 400 U.S. 410, 416 (1971) (invalidating administrative restrictions on mailing of obscene matter and quoting Justice Holmes dissent in *Milwaukee Soc. Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 437 (1921): "The United States may give up the post office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ."); *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (statute requiring Post Office to obtain authorization from addressee before delivering certain designated types of mail violates the addressee's First Amendment rights). As the Court observed in *United States Postal Service v. Greenburgh Civic Associations*, 453 U.S. 114 (1981), "[h]owever broad the postal power conferred by Article I may be, it may not of course be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment to the Constitution."

The Supreme Court has indicated that federal government restrictions on postal communications involving commercial speech are to be evaluated using the same test applicable to broadcast communications involving commercial speech. The leading case is *Bolger*, in which the Court held that the provisions of 39 U.S.C. § 3001(e)(2), prohibiting the mailing of unsolicited advertisements for contraceptives, were unconstitutional as applied to the informational pamphlets at issue. In so holding, the Court applied precisely the same four-part test from *Central Hudson* for restrictions on commercial speech that it applied to the broadcast communications at issue in *Greater New Orleans*. See 463 U.S. at 68–69. I therefore conclude that the *Central Hudson* test is applicable to 18 U.S.C. § 1302, and with the same results reached in *Greater New Orleans*, insofar as that statute prohibits the mailing of truthful advertising concerning lawful gambling operations.

The Court's reasoning in *Greater New Orleans* with respect to § 1304 is directly applicable to § 1302. The mailing prohibition of § 1302, like the broadcasting

6

prohibition of § 1304, does not directly advance the federal government's interest in minimizing the social costs of casino gambling because it is subject to the very same nationwide statutory exceptions that the Supreme Court held fatally undermined the constitutionality of § 1304's analogous prohibitions against the broadcast of gambling advertisements. *See* 18 U.S.C. § 1307; 25 U.S.C. § 2720 ("sections 1301, 1302, 1303, and 1304 of title 18 shall not apply to any gaming conducted by an Indian tribe pursuant to this chapter"). Thus, advertisements for State-conducted lotteries, Indian gaming operations, and the additional exemptions authorized by the Charity Games Advertising Clarification Act of 1988, 18 U.S.C. § 1307(a)(2), are exempted from the mailing provisions of § 1302 as well as from the broadcast provisions of § 1304. Accordingly, for the reasons set forth by the Supreme Court in *Greater New Orleans*, § 1302, like § 1304, cannot constitutionally be applied to prohibit the transmission of truthful information or advertisements concerning lawful gambling activities.[2]

This conclusion is not intended to address the question whether Congress could amend applicable statutory law in this area in a manner that would conform to the governing constitutional standards. As the Supreme Court explained in *Greater New Orleans* with reference to the restrictions on broadcast advertising contained in 18 U.S.C. § 1304, "[h]ad the Federal Government adopted a more coherent policy, or accommodated the rights of speakers in States that have legalized the underlying conduct, this might be a different case." 527 U.S. at 195 (citation omitted). The Department is unable to conclude, however, that existing federal law respecting the mailing of information or advertisements concerning legal gambling (apart from State-operated lotteries) is any more satisfactory in this respect than the broadcast restrictions invalidated in *Greater New Orleans*.

## B.

In assessing the impact of *Greater New Orleans* on § 1302's prohibitions against mailing of gaming information, I consider it important to emphasize that many significant applications of the statute should remain unaffected by that decision. Because the Department is not persuaded that the *Greater New Orleans* holding renders § 1302 unconstitutional in all its applications, my decision to restrict future enforcement of the statute is limited in scope. *See United States v. Grace*, 461

---

[2] Prior to the Supreme Court's opinion in *Greater New Orleans*, two district courts had rejected First Amendment challenges to § 1302 brought by a magazine that carried advertisements for lotteries and casinos, *Aimes Publications, Inc. v. U S Postal Service*, No. 86–1434, 1988 WL 19618 (D.D.C. 1988), and by an association of newspapers whose members wished to carry lottery advertising, *Minnesota Newspaper Ass'n, Inc v Postmaster General*, 677 F Supp. 1400 (D Minn 1987) (§ 1302 held constitutional as applied to lottery advertisements, but unconstitutional as applied to mailing of newspapers containing prize lists), *vacated as moot*, 490 U S 225 (1989). Because both of these decisions are grounded upon the courts' finding that the statute directly advances the government interests in minimizing the social costs associated with gambling, or supporting the policies of States that restrict or prohibit gambling, *see Aimes*, 1988 WL 19618, at *3 and *Minnesota Newspaper Ass'n*, 677 F Supp. at 1404–05, they cannot be reconciled with the subsequent holding in *Greater New Orleans* that the efficacy of the attempt to advance those interests is undercut by the statutory exemptions that permit the nationwide promotion of various kinds of gambling.

U.S. 171, 180–82 (1983). The Department continues to regard § 1302 as enforceable in a number of significant applications.

First, my non-enforcement decision is limited to mailed information and advertisements concerning *lawful* gambling activities. Neither the Department nor the Postal Service asserts that § 1302 is inapplicable to, or unenforceable against, the mailing of advertisements for illegal gambling activities, and nothing in *Greater New Orleans* establishes that § 1302 would be unconstitutional as applied to such advertising. *See* 527 U.S. at 184; *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 497 n.7 (1996).

Second, my decision applies only with respect to *truthful, nonmisleading* gambling advertisements. Neither the Department nor the Postal Service suggests that the First Amendment entitles anyone to mail false or misleading advertising. The Supreme Court repeatedly has held that false and misleading advertising is not protected by the First Amendment, and *Greater New Orleans* does not suggest otherwise. *See* 527 U.S. at 184–85; *Central Hudson*, 447 U.S. at 566.

Third, the mailings covered by my decision do not include advertisements concerning state-operated lotteries. The regulatory regime for state lottery advertising is different from that for advertising for other forms of lawful gambling: read together, 18 U.S.C. §§ 1302 and 1307(a)(1)(A) prohibit the mailing of advertisements for state lotteries contained in publications published in non-lottery States, while expressly exempting the mailing of such lottery advertisements contained in publications that are published in a lottery State. In *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 428 (1993), the Supreme Court expressly upheld the constitutionality of the corresponding provisions of 18 U.S.C. §§ 1304 and 1307(a) that apply to broadcasters in non-lottery States and stressed that such application properly advanced the "congressional policy of balancing the interests of lottery and nonlottery States."

Finally, I note that this non-enforcement decision does not extend to the application of § 1302 insofar as that section applies to the use of the mails for the actual conduct or operation of gambling activities through the mails, as distinguished from informational or advertisement mailings. Rather, this decision applies only to the enforcement of § 1302 with respect to truthful informational mailings or advertisements concerning lawful gambling.

## CONCLUSION

For the foregoing reasons, and subject to the above-stated qualifications, I have determined that the application of 18 U.S.C. § 1302 to prohibit the mailing of truthful, nonmisleading information or advertisements concerning lawful gambling

operations would be unconstitutional. Accordingly, the Department will refrain from enforcing the statute with respect to such mailings.

Sincerely,

JANET RENO
*Attorney General*

# OPINIONS

OF THE

# OFFICE OF LEGAL COUNSEL